## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ____ |  : | Civil Action No. 14-5247 (FLW) |
| RAY V. CAPRIO, | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, United States District Judge**:

Ray V. Caprio ("Caprio" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Covlin ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, affirms the decision.

## I.       FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on June 28, 1960, and was 47 years old on the alleged disability onset date of June 1, 2006. A.R. 93 (hereinafter "A.R."). Plaintiff has a high school education. A.R. 93. Prior to his alleged disability, Plaintiff worked as the president of a mortgage company. A.R. 55.

In August 2010, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on June 1, 2006. A.R. 278-79. Plaintiff's claim was denied on December 13, 2010, A.R. 157-61, and again upon reconsideration on April 25, 2011. A.R. 162-65. On June 1, 2011, Plaintiff requested a hearing, A.R. 166, which was held on May 17, 2012, before ALJ Michal

L. Lissek.  A.R. 87-129.  The ALJ determined that Plaintiff was not disabled and denied his claims for disability insurance benefits. A.R. 135-42.  On October 1, 2012, Administrative Appeal Judges Cynthia P. Anderson and A. Van Soest ordered that Plaintiff's matter be remanded for further consideration based on the following issues:

- The ALJ determined Plaintiff could perform semi-skilled work, but did not address the State Agency Medical Consult's conclusion that claimant was limited to simple routine work;

- The ALJ did not address that a January 2010 sleep study concluded Plaintiff had a mild sleep disorder which might be related to Plaintiff's claims of fatigue;

- The vocational expert testified that Plaintiff had acquired skills transferrable to other sedentary jobs, but did not identify those skills; and

- The ALJ did not address Plaintiff's change of age category.

A.R. 150-52.

A second hearing was held on February 5, 2013, before the same ALJ.  A.R. 47-86. Plaintiff, who was represented by John Forte, Esq., at the second hearing, appeared and testified, A.R. 55-72, and testimony was taken from Rocco J. Meola, a vocational expert, A.R. 72-85.  On February 26, 2013, the ALJ issued a decision denying disability and supplemental income.  A.R. 25-40.  Plaintiff requested review by the Appeals Council, which was denied on September 10, 2013.  A.R. 7-9.  On July 22, 2014, the Appeals Council granted Plaintiff additional time to file the present appeal.  A.R. 2.  On August 21, 2014, Plaintiff filed the present appeal against Defendant.

### A.    Review of the Medical Evidence[1]

---

[1] The Court notes that numerous pages of the medical record consist of handwritten and poorly photocopied notes.

On April 22, 1998, a biopsy of Plaintiff's liver revealed that he had moderate chronic hepatitis C, minimal steatosis, and no formation of cirrhotic nodules.  A.R. 373-74.  A review of Plaintiff's treatment records from 1998 to 2002 indicates that Plaintiff complained of headaches, an inability to sleep, and fatigue, and varying levels of energy.  *See* A.R. 359-67.

Beginning on February 13, 2006, Plaintiff began treatment with Kevin Bell, M.D.  A.R. 527.  Dr. Bell's notes indicate that on July 2, 2007, Plaintiff reported feeling "profound fatigue." A.R. 548.  On July 11, 2007, laboratory tests showed Plaintiff had an elevated alanine transaminase ("ALT") level.  A.R. 589.  On August 14, 2007, Plaintiff reported that he continued to feel fatigue. A.R. 547.

On October 9, 2007, Dr. Bell's notes appear to indicate that he referred Plaintiff to be evaluated for his fatigue.  A.R. 546.  On October 10, 2007, Dr. Bell's notes appear to indicate that Plaintiff had elevated ALT and aspartate aminotransferase ("AST") levels. A.R. 546, and records from November 1, 2007 indicate that Mr. Caprio had elevated ALT and AST levels.  A.R. 586.

On November 16, 2007, Dr. Douglas Dieterich, M.D., authored a "to whom it may concern" letter on behalf of Plaintiff, stating:

> Mr. Caprio has hepatitis C diagnosed in 1987.  He has been treated multiple times. His liver biopsy, which was done in 2006, shows stage III/IV disease that has transitioned to cirrhosis.  Three treatments have failed, and he is awaiting new therapies at the moment.  Because of his hepatitis C, he is disabled and can no longer work.  The progression towards cirrhosis and the high viral loads have caused him to be disabled, and he is not capable of employment at this time.  He is planning to start treatment very soon and will be actually further disabled by the side effects and from the pegylated interferon and ribvarin.

A.R. 646.

On January 1, 2008, August 8, 2008, and August 25, 2008, laboratory tests showed that Plaintiff continued to have elevated ALT and AST levels.  A.R. 579, 582, 585.  On April 9, 2008, Plaintiff was admitted to the hospital under the care of Dr. Dieterich, where he underwent an HCV

protease inhibitor treatment, and was discharged the following day.  A.R. 419-25.  On May 6, 2008, Plaintiff was again admitted to the hospital for HCV protease inhibitor treatment, and was discharged on May 7, 2008.  A.R. 426-29.

On August 8, 2008, laboratory tests revealed Plaintiff had abnormally high ALT, AST, and lactate dehydrogenase ("LDH") levels.  A.R. 482.

On November 16, 2008, Plaintiff went to the emergency room of Morristown Memorial Hospital complaining of chest pain.  A.R. 432. Although Diane Heller, M.D., diagnosed possible neutropenia and recommended admission, Plaintiff refused to be admitted and left the ER against medical advice.  A.R. 435-436.

On December 12, 2008, laboratory tests showed Plaintiff had elevated AST and ALT levels.  A.R. 577.  On December 18, 2008, Dr. Dieterich's notes indicated that Plaintiff was in his eighth month of treatment with pegylated interferon and ribvarin  ("PEG RBV"), and that he was "doing well" on that treatment.  A.R. 694, 696. Dr. Dieterich also noted that Plaintiff's wife had gotten pregnant several weeks after he started treatment, and that they were expecting a baby in January 2009.  A.R. 694.  Plaintiff had a normal gastrointestinal (GI) exam with normal bowel sounds, no hepatosplenomegaly (enlargement of the liver and spleen), and a non-tender abdomen without masses A.R. 696.

On January 27, 2009, Dr. Dieterich reported that Mr. Caprio's treatment lasted 48 weeks and was to be completed on March 11, 2009.  A.R. 689-690.  Plaintiff reported that he engaged in sexual activity, and on examination, he was in no distress, exhibited normal bowel sounds, a non-tender abdomen without masses, no hepatosplenomegaly, and was negative for depressed mood and flat affect.  A.R. 690-691.

On April 9, 2009, Dr. Dieterich examined Plaintiff, who reported that he still felt tired, but that he had had several good days, and was sexually active. A.R. 682-683. Plaintiff was in no distress, had normal bowel sounds, and was awake and oriented. A.R. 683.

On June 9, 2009, Plaintiff underwent an ultrasound of the abdomen at Mount Sinai Hospital, which revealed mild diffuse hepatic parenchymal disease and mild splenomegaly. A.R. 468, 701. On that same date, Dr. Dieterich's records again indicated that Plaintiff was sexually active, and an examination revealed that he was in no acute distress, had normal bowel sounds, a normal gait, and no edema. A.R. 679-81. On August 14, 2009, laboratory tests showed Plaintiff's ALT, AST, Bilirubin, LDH, and testosterone were within normal levels. A.R. 567.

On November 12, 2009, Plaintiff underwent a CT scan of his chest at Morristown Memorial Hospital, which revealed clear lungs, a normal aorta, pericardium, and pulmonary arteries. A.R. 485. A CT angiogram, performed that same date, was also normal, with no evidence of intracardiac thrombus or congenital abnormalities. A.R. 486. On March 23, 2010, laboratory tests showed Plaintiff's testosterone was within normal levels. A.R. 560.

On April 28, 2010, Dr. Bell referred Plaintiff to Dr. Matthew Surgan, M.D., to evaluate him for fatigue, possibly adrenal insufficiency, and possible hypogonadism. A.R. 512. Plaintiff reported a long history of fatigue, which was "at its worst about 2-3 years ago," as well as a history of polysubstance abuse, anabolic steroid use, and hepatitis C. A.R. 512. Plaintiff reported that the most recent round of PEG RBV therapy "cured" his hepatitis C, and that "his fatigue had lessened since its peak 2-3 years ago, but persists and still impacts on his ability to undertake many activities he enjoys" including "exercise" and "playing golf." A.R. 512. Plaintiff described feeling like he was walking though water. A.R. 512. Dr. Surgan noted that Plaintiff's testosterone level tested in the lower portion of the normal range, and that he had received two small doses of testosterone

which resulted in improved energy and libido, although Plaintiff reported that his sexual function had always been "intact."  A.R. 512.  Dr. Surgan noted that "[t]he etiology of the fatigue frequently associated with Hepatitic C is unclear" and indicated that possible causes included hypogonadism and/or adrenal insufficiency, and ordered additional testing. A.R. 514.

On June 3, 2010, Dr. Dietrich examined Plaintiff and noted that he was in no acute distress; had normal bowel sounds; no hepatosplenomegaly; a non-tender abdomen; no stigmata (signs of chronic liver disease); and was negative for a depressed mood and flat affect.  A.R. 671-672.

On June 10, 2010, Plaintiff was treated in the ER of the Morristown Memorial Hospital for vomiting.  A.R. 490.  Plaintiff stated that he had accidently taken Suboxone, which he thought was Xanax, prior to the onset of his symptoms. A.R. 490.  Plaintiff was diagnosed with nausea and vomiting and discharged.  A.R. 493.

On June 15, 2010, Dr. Dieterich's treatment notes indicate that Plaintiff was "still disabled after interferon treatment and cannot work." A.R. 662, 666.  On June 15, 2010, laboratory tests indicated that Plaintiff's testosterone was within normal levels.  A.R. 472

On June 29, 2010, Dr. Dieterich's treatment notes indicate that Plaintiff stated he was "extremely fatigued" and "often bedridden," but that he also "currently engages in sexual activity." A.R. 656.  Laboratory tests collected on that same date showed Plaintiff's testosterone levels were within normal levels.  A.R. 470.  Also on that same date, Dr. Dieterich wrote a second "to whom it may concern" letter, which stated:

> Mr. Ray Caprio is a 50 year-old male with a 30 year history of Hepatitis C, Genotype A1 an advanced form of the disease.  Mr. Caprio has been successfully treated in the past for a malignant melanoma.  He is also a carrier of the Epstein Barr virus which is an indirect contributor to his extreme fatigue, depression, and mental confusion.  The main cause of his fatigue and depression stems from his Hepatitis C virus which is in the third stage of four.  The fourth and final stage is cirrhosis.

Currently, Mr. Caprio has significant liver disease and must be monitored routinely for liver cancer [due] to the high rate of liver cancer in patients with advance liver disease.  The liver disease [exacerbates] his fatigue, depression and has been unable to perform normal routine living functions which have rendered him totally disabled and incapable of working.  Due to his liver disease, his testosterone levels are low and he is not able to perform sexually and contributes to his fatigue.  With his lack of energy and severe depression he is also being treated with SSRI's to help him cope.  He takes Fioricet and Codeine and Xanax, as well as other meds for depression and anxiety.  All of these medicines are given at low doses in order not to further damage his liver.

Mr. Caprio has elevated ANA levels and there is a concern for the development of an autoimmune disease e.g., Lupus.  He has been tested for Lupus and is continuously tested to identify any signs and symptoms of any autoimmune diseases.  He has had several interferon treatments in the past several years and he has suffered partial hearing loss which was treated with prednisone unsuccessfully.  His current enzymes and [illegible] are currently under control; however they must be closely monitored for signs of advancing cirrhosis, liver cancer and liver failure.  He is disabled and cannot work due to his liver disease.

A.R. 645.

On August 5, 2010, Dr. Deiterich's notes indicate Plaintiff had been treated for low testosterone with testosterone gel and that Plaintiff reported being sexually active and that he had used prednisone to treat a migraine which helped his fatigue level.  A.R. 641-642.  On examination, Plaintiff was in no distress and was awake, alert, and oriented.  A.R. 642.

On September 10, 2010, Dr. Bell wrote to New Jersey Disability Determination Services, and stated, in relevant part:

Mr. Caprio was born on 6/28/60.  He contracted Hepatitis C approximately ten years ago.  When I first saw him on 2/13/06 he had been through four cycles of Interferon without remission.  He was ultimately referred to the Mount Sinai Medical Center, Dr. Douglas Dieterich.  He received treatment with intravenous treatment with Robovarin and is level of the virus has reduced significantly.  As a result of the Hepatitis C he has plagued with a chronic fatigue picture which has been evaluated by myself as well as an endocrinologist, Dr. Matthew Surgan.  As a result of the Hepatitis his conversion of testosterone to free testosterone was reduced with a resultant increase in the inactive hormone.  This is an aftermath of the liver disease.  The patient has had treatment of glucosteroid for status migraine which helped the picture of the fatigue.  Please note that the doses of steroid required for him to be asymptomatic would have long term determinant.  You are

in the process of giving him intramuscular steroids but he remains listless with noticeable diminution of his strength and endurance. These symptoms have been ongoing for approximately three years. I do not see that they will resolve and consider Mr. Caprio to be permanently disabled.

A.R. 528.

On September 26, 2010, Esha Khoshnu, M.D., a consultative psychiatrist, evaluated Mr. Caprio at the request of the Social Security Administration. A.R. 521-523. Plaintiff reported that he had agitation, slept "too much or too little," and could not work because of his fatigue. A.R. 521. Plaintiff denied any history of psychiatric illness, treatment from a mental health provider, suicidal attempts, and psychiatric hospitalization. A.R. 521. With regard to his daily activities, Plaintiff indicated that he watched television and cared for himself, and acknowledged his ability to manage his own money. A.R. 521. A mental status examination revealed no significant abnormalities: Plaintiff was alert and oriented; denied suicidal and homicidal ideations and hallucinations; could spell world forward and backward; perform some serial 7s; name the past five presidents; and recall three of three items immediately and one of three after several minutes A.R. 522-23. Dr. Khoshnu diagnosed mood disorder secondary to medical condition, ruled out bipolar disorder, and ruled out mood disorder secondary to medication. A.R. 523.

On September 2, 2010 Plaintiff underwent an ENT evaluation by George Beecher, M.D., for complaints of soreness on the right side of his neck. A.R. 593. During the examination, Plaintiff admitted that "he was lifting some weights prior to the pain starting." A.R. 594.

On September 8, 2010, Paul Presti, M.D., wrote to Dr. Bell in response to his referral of Plaintiff for right neck pain; Dr. Presti indicated that he had examined Plaintiff and stated that other than Plaintiff's complaints of occasional pain while swallowing, Plaintiff was in "his usual state of good health. He does not feel ill, he has no lethargy, and remains very active." A.R. 595.

Dr. Presti also indicated that Plaintiff remained asymptomatic from hepatitis C and Plaintiff "appears in good health." A.R. 595-596.

On October 23, 2010, Sabahat Bokhari, M.D., a consultative examiner, evaluated Mr. Caprio at the request of the Social Security Administration. A.R. 524-526. Plaintiff stated that he had progressively worsening fatigue, lightheadedness, headaches, and a lack of energy for about a year. A.R. 524. Plaintiff denied any history of depression or mental confusion. A.R. 524. Dr. Bokhari's examination revealed no abnormalities, and Dr. Bokhari indicated that Plaintiff was in no distress; had a normal gait; used no hand-held devices for ambulation; had full range of motion in all joints; and full motor strength and sensation. A.R. 525. Dr. Bokhari diagnosed hepatitis, cirrhosis, complaints of extreme fatigue and lightheadedness, GERD, and that Plaintiff was positive for Epstein-Barr virus due to mononucleosis. A.R. 525.

On November 4, 2010, laboratory results showed Plaintiff's testosterone levels were within normal levels. A.R. 550

On November 10, 2010, Toros Shahinian, M.D., reviewed the record at the request of the state agency, and opined that Plaintiff's medically determinable impairments of hepatitis C, cirrhosis, Epstein-Barr, migraines, partial hearing loss, and depression were non-severe. A.R. 609. On April 5, 2011, Nancy Simpkins, M.D., another state agency physician, reviewed and affirmed Dr. Shahinian's non-severe rating. A.R. 703.

On November 22, 2010, P. Polizos, M.D., a state agency psychiatrist, completed a psychiatric review technique ("PRT") form and a mental RFC assessment of Plaintiff. A.R. 610-626. Dr. Polizos opined that Plaintiff had moderate restrictions in his activities of daily living, and moderate difficulties in social functioning and in maintaining concentration, persistence, or pace, but no episodes of decompensation. A.R. 620. Specifically, Dr. Polizos found that, based on the

evidence, Plaintiff was able to understand, remember and execute instructions; maintain and sustain attention, concentration, pace, and persistence; respond, relate and adapt in the workplace; and perform simple routine tasks.  A.R. 626.  On April 15, 2011, Wayne Tillman, Ph.D., another state agency psychologist, reviewed and affirmed Dr. Polizos' psychological assessment.  A.R. 704.

On March 18, 2011, Dr. Dieterich reported that Mr. Caprio's liver condition was "cured" but he continued to have post-Interferon weakness, tiredness, and occasional confusion.  A.R. 787.  Plaintiff reported being sexually active, and, on examination, was in no distress, had no GI masses, and was awake, alert, and oriented.  A.R. 787-788.

On March 18, 2011, Dr. Dieterich completed a Liver Disease Impairment Questionnaire.  A.R. 634-639.  The doctor reported treating Plaintiff since February 2008 for Hepatitis C and post-Interferon symptoms, and that he most recently examined Plaintiff on March 18, 2011.  A.R. 634.  Dr. Dieterich noted that while he used to see Plaintiff every two weeks, he currently only saw him every two to three months, that Plaintiff had hepatitis C and post-interferon symptoms, and that his prognosis was "unknown." A.R. 634. Clinical findings included abdominal and/or joint pain, loss of appetite/weight loss, persistent or relapsing chronic fatigue, weakness, tiredness, and occasional confusion.  A.R. 634-635.  Dr. Dieterich also cited low testosterone and low cortisol levels in support of his findings.  A.R. 635. The doctor reported that Mr. Caprio's fatigue began in 2006, and he continued to experience fatigue after treatment with Interferon in 2008.  A.R. 636.  Dr. Dieterich opined that Plaintiff's symptoms and limitations began in 2006.  A.R. 639.  Dr. Dieterich opined that in an 8-hour workday, Plaintiff could sit for 1 hour, stand/walk for 1 hour, and needed constant rest.  A.R. 636-637.  Dr. Deiterich also stated Plaintiff could occasionally lift/carry 10 pounds.  A.R. 637.  Dr. Dieterich opined that Plaintiff was not a malingerer and that

10

emotional factors contributed to the severity of his symptoms and functional limitations.  A.R. 637.  Dr. Deiterich noted that there was also evidence of impaired memory, change in affect, change in ability and concentration, and difficulty or restriction in activities of daily living, A.R. 637-38, and that Plaintiff's pain, fatigue, or other symptoms were severe enough to interfere with his attention and concentration "constantly."  A.R. 638.  Dr. Dieterich indicated that Plaintiff was incapable of tolerating even low stress work because "Patient is constantly fatigued and could not perform daily tasks of a job."  A.R. 638.  Dr. Dieterich indicated that Plaintiff had good days and bad days, and that he was likely to be absent from work more than three times a month.  A.R. 638.

On April 13, 2011, laboratory tests showed Plaintiff had normal ALT, AST, and testosterone levels, but a high Bilirubin level.  A.R. 721.  On, September 15, 2011, laboratory tests show Plaintiff had a low ALT level, and normal AST and Bilirubin levels.  A.R. 737.

On January 10, 2012, Mr. Caprio was evaluated for obstructive sleep apnea and underwent a polysomnography study (on August 30, 2011).  A.R. 776-777.  Plaintiff reported typically falling asleep within 15 minutes, some diaphoresis (sweating), but no awakenings with gasping, choking, or palpitation.  A.R. 776. Plaintiff stated that he typically woke around 8:00 a.m. without an alarm, and that he sometimes felt good and refreshed upon waking, but that, other times he felt tired and uncomfortable.  A.R. 776.  Plaintiff also reported taking naps almost every day that usually lasted an hour or longer, but were not always refreshing, and reported no drowsiness while driving.  A.R. 776.  Treatment notes indicated that Plaintiff's hepatitis C was in remission, but that he had a sense of fatigue, and had to "withdraw from work as a result of his liver disease and subsequent recovery." A.R. 776-777. On examination, Plaintiff was in no distress, had an unremarkable abdomen, and was assessed with mild sleep disordered breathing with associated daytime sleepiness.  A.R. 777.  Plaintiff was diagnosed with mild sleep disordered breathing with

associated daytime sleepiness, Hepatitis C in remission, and acid reflux.  A.R. 777.  It was noted that Plaintiff's condition might be related to his symptoms of persistent fatigue, but could also be an outcome of liver disease and treatment.  A.R. 777.

On February 28, 2012, laboratory tests showed Plaintiff's ALT, AST, Bilirubin levels were within normal ranges.  A.R. 770.

On March 16, 2012, Dr. Dieterich's treatment notes indicated that Plaintiff still "very fatigued [and] not able to work," A.R. 779.  Plaintiff reported that he engaged in sexual activity, and examinations revealed that he was in no acute distress, had no masses in his GI, a normal gait, no edema, and was alert, awake, and oriented.  A.R. 780.  Laboratory tests showed Plaintiff's ALT, AST, Bilirubin, and LDH levels were within normal ranges, and his testosterone level was high.  A.R. 782, 796, 797.

On April 26, 2012, Dr. Dieterich completed a second Liver Disease Impairment Questionnaire. A.R. 799-804.  The diagnoses, medical findings, and limitations described therein were not significantly different from those detailed in the first questionnaire, already detailed *supra*, except that Dr. Dieterich now also noted there was evidence of personality change, problems maintaining social function, and altered judgment.  A.R. 802-803.

On June 6, 2012, Plaintiff was evaluated by orthopedist David J. Feldman, M.D., for progressively worsening back pain.  A.R. 830.  An examination revealed tenderness in the mid thoracic lumbosacral junction, mild paraspinal tenderness, and pain with lateral bend and rotation.  X-rays of the spine revealed scoliosis and mild degenerative changes.  A.R. 830. Dr. Feldman diagnosed acute and chronic low back derangement.  A.R. 830. The doctor ordered MRI's and Plaintiff was referred to physical therapy.  A.R. 830.

12

On June 12, 2012, Dr. Dieterich completed a third "to whom it may concern" letter,

which stated:

> Mr. Caprio has been under my care since 2003, for symptoms related to chronic hepatitis C and migraine headache. Positive clinical findings include anorexia, loss of appetite with weight loss, abdominal and/or joint pain, persistent or relapsing chronic fatigue, weakness, and occasional confusion.

> Mr. Caprio was diagnosed with hepatitis in 1987, and has since that time undergone multiple treatments.  Subsequent to Intereferon treatments, Mr. Caprio continued to experience disabling weakness and occasional confusion.  In 2005, a liver biopsy was performed that revealed Stage III/IV disease transitioning into cirrhosis.

> Mr. Caprio['s] physical limitations include a maximum ability to sit for one hour and stand and walk for one hour in an eight-hour workday.  Emotional factors also contribute to the severity of Mr. Caprio's symptoms and functional limitations, which result in memory impairment, personality change, change in affect, change in ability and concentration, difficulty maintaining social function, and difficulty or restriction in activities of family living.  As a result, Mr. Caprio requires constant rest.  Mr. Caprio is incapable of tolerating even low stress work and will likely be absent from work more than three times monthly as a result of his impairments and treatment.

> Based upon history and my last evaluation, it is my best medical opinion that Mr. Caprio's impairments have existed since 2006 and are expect to [last] at least twelve months.  My letter dated November 16, 2007 and Liver Impairment Questionnaires dated March 18, 2011 and April 25, 2012 remain valid.

A.R. 809.

On June 15, 2012, Dr. Bell also completed a "to whom it may concern" letter, which

stated:

> Mr. Caprio has been under my care since February 13, 2003, for symptoms related to chronic hepatitis C, gastroesophageal reflux disorder, and migraine headaches.

> Prior to my treatment, Mr. Caprio previously underwent four cycles of Interferon without remission.  He was then referred to the Mount Sinai Medical Center.  Mr. Caprio was then started on intravenous treatment with Riboviran and saw improvement with a significantly reduced level of virus. However, the side effects of the treatment resulted in chronic fatigue. At current, Mr. Caprio remains listless with noticeable diminution of his strength and endurance.

> Based upon history and my last evaluation, it is my best medical opinion that Mr. Caprio's symptoms and impairments have been ongoing since 2007. I do not see that they will resolve and consider Mr. Caprio to be permanently disabled. My narrative dated September 10, 2010 remains valid.

A.R. 810.

On June 26, 2012, Dr. Dieterich notes that Plaintiff continued to have symptoms of "fatigue and malaise." A.R. 840. Plaintiff reported that he engaged in sexual activity, and examinations revealed that he was in no acute distress, had no masses in his GI, a normal gait, no edema, and was alert, awake, and oriented. A.R. 840. On June 26, 2012, laboratory tests indicated Plaintiff had normal levels of ALT, AST, LDH, Bilirubin, and testosterone. A.R. 843

On July 7, 2012, Gordon Melville, M.D. performed an MRI of Plaintiff's thoracic spine, which revealed scoliosis. A.R. 826.

On July 10, 2012, Steven Honickman, M.D., performed an ultrasound of Plaintiff's abdomen, which revealed small cysts in Plaintiff's left kidney, but no evidence of a hepatitis-related malignancy in the liver, and no significant findings in the liver, spleen, gallbladder, bile duct, upper abdominal aorta, or inferior cava. A.R. 824.

On July 20, 2012, Eric Lazar, M.D., performed an MRI of Plaintiff's lumbar spine, which revealed interval development of mild degenerative disc disease and mild central canal stenosis at L4-L5, and an infrapedicular disc herniation resulting in a slightly narrowed left neural foramen. A.R. 822. On July 31, 2012, laboratory tests showed Plaintiff had normal ALT, AST, Bilirubin, and testosterone levels. A.R. 847

On August 20, 2012, Dr. Bell completed a report on Plaintiff's functional capacity. A.R. 812-813. Dr. Bell opined that Plaintiff could not work a full 8-hour workday. A.R. 813. Additionally, Dr. Bell noted Plaintiff was a candidate for disability benefits and that his disability was expected to last 12 month or more, and had begun in June 2006. A.R. 813.

14

Although many of Dr. Bell's notes are illegible, Plaintiff represents that Dr. Bell administered 61 testosterone injections to Plaintiff from October 6, 2010 through September 27, 2012.  *See* A.R. 529-530, 760-769, 806-807, and 814-815.  On November 19, 2012, laboratory tests showed Plaintiff had low testosterone levels.  A.R. 816

On January 11, 2013, Dr. Bell wrote a letter to Plaintiff's counsel indicating that Plaintiff had received multi-drug therapy for hepatitis C, and had chronic fatigue, depression, and low testosterone levels as a result of his disease and treatment.  A.R. 873.  In addition, Dr. Bell stated that as a result of Plaintiff's illness, he "has been unable to perform his job as a Mortgage Banker," for the past seven years, and that he did not foresee an improvement in Plaintiff's medical condition.  A.R. 873.

On April 9, 2013, Dr. Bell completed a multiple impairment questionnaire indicating that Plaintiff had chronic debilitating fatigue due to liver damage from hepatitis C.  A.R. 875. Dr. Bell rated Plaintiff's fatigue at a 10 on a scale of 1-10, and opined that Plaintiff could sit for 1-2 hours, and stand or walk for up to one hour in an eight-hour workday.  A.R. 877. In addition, Dr. Bell indicated that Plaintiff could occasionally lift and carry up to 20 pounds, and that fatigue caused limitations in all activities including reaching, handling, fingering or lifting. A.R. 877-78. Dr. Bell further opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment, that his condition interfered with the ability to keep his neck in a constant position, would frequently severe enough to interfere with Plaintiff's attention and concentration, and that he could not work.  A.R. 878-80. Specifically, Dr. Bell stated that Plaintiff's "symptoms increased severely in 2006 when Hepatitis progressed."  A.R. 881.

On April 12, 2013, Dr. Dieterich completed a third liver disease questionnaire.  A.R. 886. Dr. Dieterich indicated that Plaintiff's prognosis was  still unknown, and that he had symptoms of

anorexia, chronic fatigue, weakness, and altered mental status but that Plaintiff's migraines were controlled with Fioricet, and that testosterone treatment had little effect on his symptoms. A.R. 886-888. Dr. Dieterich opined that Plaintiff could sit for two hours and stand/walk for one hour in an eight-hour workday, and that Plaintiff would have to get up and move around every hour A.R. 888-889. Dr. Dieterich also opined that Plaintiff could occasionally lift and carry up to 20 pounds, that his fatigue would frequently interfere with his attention and concentration, and that he was not capable of tolerating a low stress job. A.R. 890.

**B.      Review of Disability Determinations**

On August 9, 2010, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on June 1, 2006. A.R. 278-79. On December 3, 2010, the Social Security Administration denied Plaintiff's claim for disability benefits. A.R. 157-59. The Social Security Administration noted the following factors in reaching its decision:

- You have hepatitis [C] and cirrhosis. However, lab tests indicate that if you continue to follow the recommended treatment, you should be able to work.

- Although you have the Epstein-Barr virus, it has not caused any infections or impairment of body function.

- Your depression affects your ability to perform some activities. However, you should be able to take care of your personal needs, do simple jobs when shown and understand and follow simple instructions.

- Due to mental confusion, you have difficulty performing certain tasks. However, you should be able to take care of your personal needs, understand and follow simple instructions and perform simple jobs.

- You have decreased hearing. However, with the use of a hearing aid, you are able to hear and understand conversations.

- You experience migraine headaches. However, these can be controlled with medication.

- Although you are not able to do any of the work you have done during the past 15 years, there are other kinds of work you should be able to do.

16

A.R. 157-58.

On September April 25, 2011, the Social Security Administration denied Plaintiff's request for reconsideration, finding that Plaintiff indicated that his condition has not changed or worsened since the initial determination and considered:

- Your condition affects your ability to perform some activities.  However, you should be able to take care of your personal needs, do simple jobs when shown and understand and follow simple instructions.

- The evidence shows no other condition which significantly limits your ability to work.

- We realize your condition prevents you from doing your usual work; however it does not prevent you from doing other types of work that is simple and easy to do.

A.R. 163.

### C.      Review of Testimonial Record

#### 1.      Plaintiff's Testimony at the First Hearing.

Plaintiff testified at the first hearing in this matter, held on May 17, 2012, before the ALJ. A.R. 87-129.

Plaintiff testified that he was 51 years old, and that he was born on June 28, 1960.  A.R. 93.  Plaintiff stated that he had a high school education, and that he has special training in the field of mortgages, which he explained as knowing "the whole gambit of the mortgage business."  A.R. 93.

Plaintiff testified that he became president of Equal Home Mortgage in 1996, and worked there until 2006.  A.R. 93-94.  Prior to working at Equal Home Mortgage, Plaintiff stated he was in construction.  A.R. 93-94.  Plaintiff described his previous career as a desk job 50% of the time, with the other 50% involving traveling to meetings and other offices.  A.R. 95-97.  Plaintiff stated that he did not have to carry anything heavy.  A.R. 96.

Plaintiff testified that he stopped working in 2006 because he "started getting really si[ck]." A.R. 97.  Plaintiff explained that he had Hepatitis C for a while, and that while he previously felt fatigue, those instances were "nothing" compared to "what happened to [him] in 2006."  A.R. 97-98.  As Plaintiff described it:

> I remember I was at someone's house, and then all of a sudden, I just couldn't move.  I was pinned to the chair.  And that's when my illness progressed.  And I learned later that I had liver damage.  And, from that day on, it's been on and off.  There's [sic] days that literally all I can do is lay down.

A.R. 98.

Plaintiff estimated he has "two or three good days" a week.  A.R. 98.  However, Plaintiff described a "good day" as "nothing" like what he used to be:

> I'm a shell of the guy I used to be.  I'm really, I lived in the gym.  I did martial arts.  I ran a company.  I coached my daughter's softball games. . . . [N]ow, a good day is . . . playing with my kid on the floor . . . a good day is . . . walking the dog.

A.R. 98.  Plaintiff described a "bad day" as one where he is "laying down" because "it's like walking through water with weights on."  A.R.  99.  Plaintiff stated he does not feel sleepy, but rather "fatigue" and, when asked what he would do on bad days, he responded:  "Almost nothing.  Just pretty much laying down and watching television."  A.R. 99.   Plaintiff stated his fatigue makes him "want to cry."  A.R. 100.

Plaintiff stated he is not able to cook or clean, although when feeling "good" he can cook eggs and oatmeal, and he can help vacuum the house, although he testified that if he did those tasks, he would then be "destroyed" the next day.  A.R. 101.    Plaintiff  testified that he is depressed, but that he does not like that word, and that he does not think that he is depressed.  A.R. 101-102.  Plaintiff described his medication as a shot of testosterone every 10 days, and the generic version of Zoloft.  A.R. 102; *see also* A.R. 118-20 (discussing other medications); A.R. 124-25 (same); A.R. 127-28 (same).  Plaintiff stated he gets headaches once a month. A.R. 102.

## 2.    Plaintiff's Testimony at the Second Hearing.

Plaintiff testified again at the second hearing in this matter, which was held on February 5, 2013, before the same ALJ.  *See* A.R. 46-86.  Plaintiff began his testimony by re-describing his previous work as the president of a company in the mortgage industry.  A.R. 55-56.  In that position, Plaintiff stated he travelled at least once a day on average.  A.R. 56.

Plaintiff stated he last worked in 2006, and that his job came to an end because he got sick.  A.R. 57.  Plaintiff testified that he knew he had Hepatitis for several years, since 1987, when the disease was diagnosed from a life insurance examination.  A.R. 57.  Plaintiff testified that he had previously experienced fatigue, but in 2006, it worsened to the point that he could not move.  A.R. 58.

Plaintiff testified regarding his medication for migraines, which he explained he suffers from frequently.  A.R. 58.  Plaintiff also stated that he was not getting treatment for his mental health issues at the time of the second hearing, but that he was taking anti-depressants, specifically, Wellbutrin and Zoloft.  A.R. 60.

Plaintiff stated that he lives with his girlfriend, who does not work. A.R. 61.  Plaintiff described his typical day as:  "If it's the average day, just wake up.  Go on the one chair and watch TV."  A.R. 62.  Plaintiff also stated that if he has good days, he "end[s] up doing stuff," like researching colleges on the internet with his daughter, or paying bills, but that if he does the activities, he winds up "paying for it the next day," which he explained mean that he has "more fatigue the next day."  A.R. 62.  Plaintiff later expanded on that topic, explaining that "paying the price" for being more active on good days meant "it would be worse than a regular day.  Just laying down all day." A.R. 65.

Plaintiff stated that he can drive himself to the grocery store on good day, and estimated that he drives "probably three time a week." A.R. 63. Plaintiff also stated that he drives to see his daughter, who lives 10 miles away from him. A.R. 63. Plaintiff testified that he socializes on the telephone a few times a day, and he gets together with friends for dinner "once in a while" A.R. 64. Plaintiff testified that he goes to church, as well. A.R. 66.

When asked whether his condition was getting better, worse, or stayed the same, Plaintiff responded "I guess it's . . . like early on, it['s] worse. Then it was, I think it's kind of the same. It's been the same[.] When I was interferon, it was much worse." A.R. 67. Plaintiff testified that the last time he was treated with Interferon was in 2009. A.R. 67. Plaintiff stated that he feels more fatigued in the afternoon, and when that happens, he lays down and takes a nap. A.R. 70. Plaintiff testified that he takes a nap once a day on average, and his naps last a "[c]ouple hours." A.R. 70. Plaintiff also stated that he has been diagnosed with sleep apnea and that he tried to use a CPap machine to treat his sleep apnea, but that it did not relieve his symptoms. A.R. 70-72.

### 3. Medical Expert Martin Fechner, M.D.'s Testimony at the First Hearing.

Martin Fechner, M.D., testified as a medical expert at the first hearing. A.R. 108-111; 114-121-123; 125-127. Dr. Fechner began with suggesting that the ALJ explore the issue of Plaintiff's prior drug abuse as a source of his fatigue, A.R. 110-111, which the ALJ explored with Plaintiff before returning to Dr. Fechner's testimony. *See* A.R. 111-114 (testimony concerning prior drug use).

Dr. Fechner testified that Plaintiff's medical conditions included Hepatitis C. A.R. 114. Dr. Fechner noted that Plaintiff stopped taking interferon in 2008, so he would be "over the effects" of that treatment. A.R. 114, 122. Dr. Fechner noted that Plaintiff's most recent evaluation, on March 16, 2012, showed that Plaintiff's Bilirubin was normal, his ALT and AST liver enzymes

were "completely normal," and that when his doctors performed a Hepatitis C RNA detection in

Plaintiff's blood, none was detected.  A.R. 114-15.  Dr. Fechner explained:

> So, that's really wonderful.  I mean, there's no evidence in the blood.  That doesn't mean it's still not there, but it's really completely controlled, thank God that it's not.  I would like to say that the degree of fatigue that this gentleman is talking about is not substantiated by the evidence in the chart.

A.R. 115.

Dr. Fechner also opined regarding Plaintiff's testosterone levels, explaining that Plaintiff's

"[t]estosterone levels are normal.  Elderly men have very lower level of testosterone. . . . [a]nd

they're not walking around fatigued in that way." A.R.116.  Dr. Fechner added that "in any case,

testosterone levels have been put up to normal with [Plaintiff] getting . . . replacement.  But that's

not going to explain his fatigue." A.R. 116.

Dr. Fechner also questioned Plaintiff's complaints of migraines because he did not "see

neurological examinations" in the record, or "medication for migraines," concluding that "I doubt

very much if he has traditional migraine.  Probably has some headaches." A.R. 118.

Dr. Fechner also disagreed with the RFC provided by Dr. Dieterich on April 25, 2012,

pointing out that Dr. Dieterich just "states it[, but] the medical evidence just doesn't . . . jive with

what these doctors are saying." A.R. 121.  Dr. Fechner opined that, in his medical opinion, Plaintiff

does not have an impairment or combination of impairments that meet or medically equal the

criteria of any listed impairment.  A.R. 121.  Dr. Fechner gave an RFC as follows:

> I would limit to full range of light activity.   [Plaintiff] could lift 20 pounds occasionally, 10 pounds frequently.  Walk and stand an aggregate of six hours in an eight hours day.  He could sit for six hours in an eight hour day, would need to stretch line anyone else would.

A.R. 121.  Dr. Fechner also stated he would not impose any non-exertional limitations.  A.R. 121-

122.

### 4.   Testimony of the Vocational Expert at the Second Hearing.

Rocco J. Meola testified as a Vocational Expert ("VE") at the second hearing in this matter.[2]  The VE testified that Plaintiff's former job, as President of a mortgage company, is a "generally sedentary" position, associated with DOT # 186.117-054.  A.R. 73.  The VE testified that the skills Plaintiff acquired in that position would be transferrable to other semi-skilled jobs in the area of administration, clerical, or supervision.  A.R.  73.  Specifically, the VE stated those skills were the ability to communicate via phone, internet, computer; the ability to do calculation; skills in utilizing various office procedures, recognizing officer procedures, rules and regulations; and skills associated with the financing industry, *i.e.*, to understand financial matters relating to mortgages and calculating interest rates.   A.R. 74.

The VE was provided with four hypotheticals by the ALJ.  The ALJ first posited the following:

> [A]ssume a hypothetical individual with the vocational profile of the claimant, and assume that he can do sedentary work, but based on his fatigue and headaches and mood or depressive disorder, which affects his ability to concentrate, he's limited to work at the semiskilled level.

A.R.  75.  The VE provided the following position such an individual could work in:  Production proofreader, DOT# 247.667-010; assignment clerk, DOT# 249.367-090; and receptionist, DOT# 237.367-038.  A.R. 75-77.  The VE testified that these jobs, in the aggregate, are available in the northern New Jersey and New York areas in the amount of 50,000, and in excess of 150,000 nationally.  A.R. 77.

---

[2] Vocational Expert Patricia Shoshana testified at the first hearing, *see* A.R. 103-108, 123-124; 128, but her testimony is not discussed herein as it has been superseded by Mr. Meola's testimony in the second hearing.

The ALJ's second hypothetical was:  "same as number one, except that [the person is] able to do a job that involves . . . frequently making decisions that involve usually one discipline or focus at a time."  A.R.  81-82.  The VE responded that the jobs he previously provided would fit the criteria of the second hypothetical, as well.  A.R. 82.

The ALJ's third hypothetical was:  "assume a hypothetical . . .the same as number two [and one], but based on severe fatigue, depression, that they would only be able to do simple work with not a lot of work related decisions throughout the day.  Would they be able to do those jobs?"  A.R. 83.  The VE responded that such an individual would not be able to perform those jobs.  A.R. 83.

Finally, the ALJ's fourth hypothetical was: "same as number [hypothetical] two, but because of their fatigue and depression, that they would be off task at least 20 percent of a work day.  Would they be able to do those jobs?"  A.R.  83.  The VE responded that such an individual would not be able to perform those jobs.  A.R. 83.

Plaintiff's attorney objected to hypotheticals one and two on the ground that there was nothing in the record to indicate that the claimant could perform semiskilled work.  A.R.  84. Plaintiff's attorney then posed two hypotheticals to the VE.  The first hypothetical was:

> [A]ssume an individual with the same age, education, past relevant work, and he would be limited to sedentary work, sit for six hours in an eight hour day, stand or walk for two hours in an eight hour day, that he would need one hour unscheduled break that day, could that individual perform the jobs identified, past relevant work or any jobs in the regional or national economy?

A.R.  84.  The VE responded "No, with that limitation, the person would not be able to sustain employment in a competitive labor market."  A.R.  84.  Plaintiff's attorney added the requirement that the individual must be absent two or more time per month to that hypothetical, which the VE stated would not change his opinion.  A.R. 84-85.

Plaintiff's attorney then posed a second hypothetical to the VE based on an individual with liver impairment who was "capable of sitting one hour in an eight hour work day, standing and walking for a total of one hour in an eight hour work  day, lifting or carrying five to 10 pounds occasionally."  A.R. 85.  Again, the VE responded that such an individual would not be able to perform work in the regional and national economies. A.R.  85.

### D.      ALJ's Findings

The ALJ issued a written decision, following the second hearing, on February 26, 2013. A.R. 25-40.  The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2011.  A.R. 27.  Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date, through his date last insured on December 31, 2011.  A.R. 27.

Second, the ALJ found that Plaintiff had the following severe impairments: "hepatitis C; depression; migraine headaches; fatigue; and obstructive sleep apnea."  A.R. 27.  The ALJ also specifically found that Plaintiff's partial heading loss was not a medically determinable impairment.  A.R. 28.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits.  A.R. 28-30.  In this step, the ALJ considered Plaintiff's hepatitis C and associated cirrhosis of the liver under section 5.05 (chronic liver disease), Plaintiff's obstructive sleep apnea under sections 3.10 (sleep-related breathing disorder), 3.09 (cor pulmonale secondary to chronic pulmonary vascular hypertension), and 12.02 (organic

24

mental disorders), of the Schedule of Listed Impairments, 20 C.F.R. Pt. 404, Subpt. P., App. 1. The ALJ noted that there was no specific listing associated with migraine headaches, but also noted Plaintiff's testimony that his headaches were well controlled with medication and that the record contained no neurological workups which would suggest an underlying neurological disorder. Similarly, the ALJ noted that there was no specific listing associated with fatigue, but dealt with that impairment as part of his analysis of Plaintiff's mental impairments.

With respect to the Plaintiff's mental impairments, the ALJ examined whether the "paragraph B" criteria were satisfied, finding that Plaintiff suffered only a "mild restriction" for activities of daily living, A.R. 28; "mild difficulties" for social functioning, A.R. 29; "moderate difficulties" for concentration, persistence, or pace, A.R. 29; and that Plaintiff has experienced "no episodes" of decompensation. A.R. 29. Accordingly, the ALJ found that the paragraph B criteria were "not satisfied" because Plaintiff's mental impairment did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." A.R. 29. The ALJ also considered the "paragraph C" criteria and found those criteria unsatisfied as well because Plaintiff had not "exhibited a tendency to decompensate and has never been hospitalized for his depression." A.R. 29.

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform the exertional demands of sedentary work as defined in 20 C.F.R. §§ 404.1567(a), with the exception that:

> Based on the claimant's fatigue, headaches, and mood or depressive disorder, which affects his ability to concentrate, he is limited to work at the semi-skilled level that involves making frequent decisions involving one discipline or one focus at a time.

A.R. 30.  In reaching this RFC determination, the ALJ extensively reviewed Plaintiff's statements concerning his physical condition, as well as his medical records concerning both his alleged physical and mental impairments.  *See* A.R. 30-37.

The ALJ rejected Plaintiff's treating physicians' Dieterich and Bell's opinions, finding them to be in conflict with the statements of other treating physicians and with their own treatment records.  A.R. 37-38.  Specifically, the ALJ noted that in September 2010, Dr. Presti noted that the Plaintiff had no lethargy, and that Dr. Beecher noted that Plaintiff had been lifting weights.  A.R. 37.  The ALJ also noted that these reports conflicted with Plaintiff's own testimony concerning his fatigue.  A.R. 37.  The ALJ also found Dr. Deiterich's opinions were inconsistent with his notes and the medical records indicating that (1) Plaintiff's testosterone was within normal limits, (2) Plaintiff never reported an inability to perform sexually, and (3) Plaintiff never had dramatic weight loss, but had in fact showed that Plaintiff had gained weight.  A.R. 37-38.

The ALJ also found Plaintiff's statements concerning his own fatigue to not be credible in light of (1) his statements to Drs. Presti, Beecher, and Surgan concerning his activities and health, and (2) his own testimony of the number of daily activities that he is able to engage in.  A.R. 38.

The ALJ also rejected the findings of the state agency physicians who found that Plaintiff's impairments were not severe, as well as the state agency psychological consultants' opinions.  A.R. 38.  The ALJ, however, placed "great weight" on the opinions of the consultative examiners, Dr. Khoshnu and Dr. Bokhari, and that of Dr. Fechner, who testified at the first hearing.  A.R. 38-39.

Fifth, the ALJ found that, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity,[3] "the claimant had acquired work skills from past

---

[3] The ALJ found that (1) Plaintiff was 51 years old on the date last insured, but that his age category subsequently changed to "closely approaching advanced age," under 20 C.F.R. §§ 404.1563; (2) Plaintiff has "at least a high school education and is able to communicate in

relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy."  A.R. 39.  In reaching this determination, the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations:  Assignment Clerk DOT# 249.367-090; Receptionist (any industry) DOT# 237.367-038; and Proof Reader DOT# 247.667-010, which the vocational expert testified existed in the regional economy and national economy in that aggregate amounts of 50,000 and 150,000, respectively.  A.R. 40.

Accordingly, the ALJ concluded that "the claimant was not under a disability, as defined in the Social Security Act, from June 1, 2006, the alleged onset date, through December 31, 2011, the date last insured."  A.R. 40.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are

---

English"; and (3) Plaintiff has acquired work skills from past relevant work, specifically, "the ability to communicate via phone, internet, computer; ability recognizing and utilizing office procedures and rules and regulations within the industry; [and the] ability to understand and determine interest and mortgage rates and ability to do calculations."  A.R. 39.

supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability.  *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether

28

the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.*  A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits.  *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  *See* 20 C.F.R. § 404.1526(a).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.*  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

29

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.   If the claimant is able to perform previous work, the claimant is determined to not be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  *Plummer*, 186 F.3d at 428.  Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  Id.

## III.     PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff makes three arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial credible evidence.  First, Plaintiff argues that the ALJ erred in rejecting the medical opinions of Plaintiff's treating physicians.  Second, Plaintiff argues the ALJ failed to properly weigh the credibility of Plaintiff's subjective complaints.  Finally, Plaintiff argues the ALJ erred in relying on the VE's testimony because the hypothetical presented to the VE did not include Plaintiff's mental limitations.  The Court shall address each argument in turn.

### A.     The ALJ Properly Rejected the Opinions of Plaintiff's Treating Physician because They Conflicted with the Objective Medical Evidence in the Record.

Plaintiff first argues that the ALJ failed to properly weigh the medical evidence by rejecting the medical opinions of Drs. Dieterich and Bell, Plaintiff's treating physicians.  The ultimate

disability and RFC determinations in social security disability matter must be made by the ALJ, not by treating or examining physicians or State agency consultants. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1); 404.1546(c)). "Although a treating physician's opinion is entitled to great weight, an ALJ may discount a treating physician's opinion that either lacks support or is contradicted by other medical evidence." *Ford v. Comm'r Soc. Sec.*, 611 F. Appx. 102, 104 (3d Cir. 2015) (citing *Plummer*, 186 F.3d at 429). However, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (citations omitted).

Here, the ALJ rejected Plaintiff's treating physicians' opinions due to inconsistency with the objective medical evidence. The ALJ identified several inconsistencies identified, specifically (1) Drs. Presti and Beecher's observation of Plaintiff's energy and activities in September 2010, A.R. 37, or (2) the internal inconsistencies with their own treatment notes concerning Plaintiff's testosterone levels, sexual function, and weight loss. A.R. 37-38 The Court agrees that Plaintiff's treating physicians' opinions are in contradiction with the objective medical evidence.[4] Plaintiff

---

[4] Indeed, with respect to Plaintiff's weight loss, the medical record indicates that in 2002, Plaintiff weighed approximately 170-180 lbs., *see* A.R. 359, 360, 362, and from 2009-2012, weighed approximately 200-210 lbs., *see* A.R. 491, 513, 525, 657, 609, 663, 672, 680, 683, 690, 695, 777, 780, 788, 830. In fact, in June 2010, when Dr. Deiterich issued his letter which related concerns about Plaintiff's supposed anorexia and weight loss, A.R. 809, Plaintiff had last weighed in at 200 lbs. on June 6, 2012, A.R. 830, and in Dr. Dieterich's own treatment records from March 16, 2012, Plaintiff weighed in at 204 lbs. A.R. 780. Further, the Court notes that shortly after opining that Plaintiff was suffering from anorexia and weight loss, Dr. Dieterich's treatment records for June 26, 2012 specifically note that, as part of his examination of Plaintiff, "no weight [is] on file for this encounter." A.R. 841. With respect to Plaintiff's sexual dysfunction, Dr. Dieterich opined that Plaintiff is "is not able to perform sexually" in a letter dated June 29, 2010,

finished interferon treatment for his Hepatitis C in 2009. A.R. 67, 689-690. Prior to that treatment, Plaintiff's AST, ALT, and LDH all tested in abnormal ranges. A.R. 577, 579, 582, 585, 586, 589. However, with only a few exceptions, laboratory tests following completion of that treatment revealed Plaintiff's AST, ALT, Bilirubin, and testosterone levels were consistently within normal levels. A.R. 470, 472, 550, 560, 567, 721, 737, 770, 782, 797, 843, 847, 816. *But see* A.R. 721 (high Bilirubin); A.R. 737 (low ALT); A.R. 782 (high testosterone); A.R. 797 (high testosterone); A.R. 816 (low testosterone). As Dr. Fechner explained at the first hearing, these medical records showed that Plaintiff was cured of Hepatitis C, over the effects of Interferon, and his enzyme levels were all normal. A.R. 114-115. Despite the existence of this objective evidence in the record, Plaintiff's treating physicians reflexively continued to identify Plaintiff's cured Hepatitis C, and the effects of his interferon treatments which ended in 2009, as the cause of his fatigue. A.R. 645, 809, 810, 873, 875. Accordingly, I find the ALJ did not err in rejecting plaintiff's treating physicians' opinions based on their conflict with the objective medical evidence in the record.

### B.   The ALJ Properly Evaluated the Credibility of Plaintiff's Subjective Complaints.

Plaintiff next argues that the ALJ failed to give adequate weight to Plaintiff's subjective testimony concerning his inability to work. "An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)). When evaluating credibility, the ALJ must consider the extent to which the claimant's self-reported symptoms can "reasonably be accepted as

---

even though, on that very same day, Dr. Dieterich's treatment notes indicate that Plaintiff stated he was "extremely fatigued" and "often bedridden," but that he also "currently engages in sexual activity." A.R. 656; *see also* A.R. 512, 641-642, 679-81, 682-683, 690-691, 780, 787-788, 840.

consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  A claimant's treatment history and daily activities are relevant factors to consider in assessing credibility.   20 C.F.R. § 404.1529(c)(3).  As the fact finder, the ALJ is empowered to determine whether the claimant's subjective complaints are supported by the evidence and, if not, the ALJ may discount them. 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found the Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]"  A.R. 37.   First, as noted above, the ALJ had already determined that the objective medical evidence in the record did not support Plaintiff's self-reports of fatigue.  Plaintiff also testified that his activities included, among other things, driving on errands, visiting his children, socializing on the telephone, getting together for dinner with friends, and attending church.  A.R. 63-66.  The ALJ also noted that in September 2010, Plaintiff reported to Dr. Presti that he was in his "usual state of good health" and that he did "not feel ill, [had] no lethargy, and remains very active," A.R. 595, and told Dr. Beecher that "he was lifting some weights prior to the pain starting" on the right side of his neck.  A.R. 594..  And in April 2010, Plaintiff reported to Dr. Surgan that his fatigue "lessened since its peak 2-3 years ago but persists and still impacts his ability to undertake many activities he enjoys (exercise, playing golf, etc.)."  A.R. 512.

Moreover, although the ALJ did not entirely credit Plaintiff's subjective complaints, he did not entirely discount them, either.  The ALJ noted that although he gave "great weight" to Dr. Fechner's medical opinion regarding Plaintiff's health, he did not adopt Dr. Fechner's opinion that Plaintiff could perform light exertional work, and instead found Plaintiff could perform sedentary work because the ALJ "afforded at least some weight to the claimant's testimony."  A.R. 39.  *See*

*Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986) (finding that subjective complaints of pain do not necessarily prevent a plaintiff from engaging in work and thus do not dictate a finding of disabled where plaintiff's complaints only support moderate as opposed to severe and disabling pain).  Based on the foregoing, this Court finds that the ALJ's credibility determination was adequately supported by substantial credible evidence and is entitled to deference.  *See Horodenski v. Comm'r of Soc. Sec.*, 215 F. Appx. 183, 188-89 (3d Cir. 2007).

### C.    The VE's Testimony Constitutes Substantial Credible Evidence because the ALJ's Hypothetical was Sufficient.

Finally, Plaintiff challenges the ALJ's reliance on the VE's testimony, arguing that that testimony was flawed because (1) the RFC was not supported by sufficient credible evidence (as argued in points I and II, above) and, therefore, the VE's testimony based on that RFC is insufficient and (2) the hypothetical posed to the VE did not include Plaintiff's moderate difficulty with concentration, persistence, or pace.  Both arguments are without merit.

As to the first argument, this Court's conclusion that the RFC was supported by substantial credible evidence renders Plaintiff's argument moot.

As to the second argument, Plaintiff is correct that if an ALJ poses a hypothetical question to a vocational expert that fails to reflect all of the applicant's impairments that are supported by the record, the vocational expert's opinion cannot be considered substantial evidence.  *Ramirez v. Barnhart*, 372 F.3d 546, 552-53 (3d Cir. 2004).  However, here, Plaintiff's objection has no support in the record.  The first hypothetical posed by the ALJ plainly included Plaintiff's limitation regarding concentration.  The ALJ stated:

> [A]ssume a hypothetical individual with the vocational profile of the claimant, and assume that he can do sedentary work, but based on his fatigue and headaches and mood or depressive disorder, *which affects his ability to concentrate*, he's limited to work at the semiskilled level.

A.R.  75 (emphasis added).  The ALJ then refined this hypothetical with a second hypothetical: "same as number one, except that [the person is] able to do a job that involves . . . frequently making decisions that involve usually one discipline or focus at a time."  A.R.  81-82.  Although the hypotheticals did not include the exact wording demanded by Plaintiff, they adequately included Plaintiff's moderate difficulty with "concentration, persistence, or pace," A.R. 29.  *See McDonald v. Astrue*, 293 F. App'x 941, 946-47 (3d Cir. 2008) ("[I]n line with her finding that [the claimant] only had 'moderate limitations with his ability to maintain concentration, persistence and pace,' the ALJ included in her hypothetical that the individual be limited to 'simple, routine tasks' and that he avoid noise extremes and bright or sudden light changes. Because the hypothetical was adequate, the vocational expert's testimony regarding other work provided substantial evidence for the ALJ's conclusion."); *Chambliss v. Colvin*, No. 13-6853, 2015 U.S. Dist. LEXIS 83443, *24-25 (D.N.J. June 26, 2015).  Accordingly, the Court finds that the VE's testimony represented substantial evidence on which the ALJ properly relied.

## IV.     CONCLUSION

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.


Dated: January 21, 2016

/s/ The Honorable Freda L. Wolfson

United States District Judge

35